IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DONALD H. SLOTTERBACK, JR.,          :
                    Plaintiff        :
                                     :
       v.                            :          3:CV-07-0341
                                     :          (JUDGE VANASKIE)
RICHARD KNOEBEL, BRIAN KNOEBEL,      :
H.H. KNOEBEL SONS, INC.,             :
                    Defendants       :

<u>MEMORANDUM</u>

Donald H. Slotterback, Jr., brings this employment discrimination action against

Defendants Knoebels Amusement Park-Elys, Knoebel Lumber, H.H. Knoebel Sons, Inc.

(referred to as "Knoebels"), President Richard Knoebel, supervisor and manager Brian

Knoebel, and Blair Faust, general manager of Knoebels' lumber yard.[1]  Before the Court on a

Motion for Summary Judgment are Mr. Slotterback's claims that Defendants discriminated

against him in the terms and conditions of his employment and in his discharge in violation of

the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq., and the

Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951, et seq.[2]  After a careful

review of the summary judgment record, I find that Mr. Slotterback has failed to present

_____

[1]In filing an Amended Complaint, Mr. Slotterback did not include as Defendants
Knoebels Amusement Park-Elys or Knoebel Lumber.  They are consequently no longer part of
this action.  (<u>See</u> Amended Complaint, Dkt. Entry 4.)

[2]For the convenience of the reader of this Memorandum opinion in electronic form,
hyperlinks to the Court's record and to authority cited herein have been inserted.  No
endorsement of any provider of electronic resources is intended by the use of hyperlinks.

sufficient evidence to allow a jury to find that Defendants' articulated non-discriminatory reasons for firing him – poor work performance and violation of company rules – are not worthy of belief. Accordingly, Defendants' Motion for Summary Judgment will be granted.

## I.  BACKGROUND

Defendant H.H. Knoebel Sons, Inc. owns and operates an amusement park and a lumberyard in Elysburg, Pennsylvania.[3]  (Defs.' Statement of Material Facts ("SMF"), Dkt. Entry 22, at ¶ 7.)  Mr. Slotterback, who was born on June 1, 1957, commenced working for Knoebels in November of 1974 as a laborer performing general cleanup at the amusement park.  (Defs.' SMF, ¶ 16.)  At the end of the 1970s, Mr. Slotterback transferred to Knoebels' lumberyard as a Yard Foreman.  (Defs.' SMF, ¶ 17.)  Shortly thereafter, he transferred to a sales position inside the lumberyard store.  (Defs.' SMF, ¶ 18.)

In 1997, while Mr. Slotterback worked in the lumberyard store, the general manager position for the lumberyard store became vacant.[4]  (Defs.' SMF, ¶¶ 20-21.)  Defendant Blair Faust was promoted to General Manager of the lumberyard and Mr. Slotterback was not. (Defs.' SMF, ¶ 23.)  Mr. Slotterback claims that Knoebels did not permit anyone else within the company to apply for the position.  (Pl.'s Statement of Material Facts ("SMF"), Dkt. Entry 28-2,

---

[3]For convenience, except for documents with numbered paragraphs, references to the summary judgment record will be to the document number and pagination generated by the electronic case filing system ("CM/ECF") listed at the top of each page of the documents filed by the parties, rather than to the exhibit number or deposition transcript used by the parties.

[4]The Lumberyard on average had approximately fifteen employees.  (Defs.' SMF, ¶ 19.)

¶ 22.)  He further claims that he did inquire into the position, but never received a response.

Mr. Faust was around thirty years old at the time of his promotion.  (See Faust Aff., Dkt. Entry

21, 143, ¶ 4.  Mr. Faust served as General Manager over the lumberyard from 1997, and

served as Mr. Slotterback's immediate supervisor until March 27, 2006, the date of Mr.

Slotterback's termination.  (Defs.' SMF, ¶ 13.)

In 1999, Mr. Faust created an outside sales position and Mr. Slotterback was promoted

to the newly created position.  (Pl.'s SMF, ¶ 26; Defs.' SMF, ¶ 27.)  Mr. Faust states that he

created the new position for Mr. Slotterback with a goal to reinvigorate Mr. Slotterback's interest

in the job and to improve his overall work performance.[5]  (Faust Aff., Dkt. Entry 21, at 144, ¶

10.)  This was the first time that Knoebels had a full-time outside sales person.  (Defs.' SMF, ¶

28; Pl.'s SMF, ¶ 28.)

According to Mr. Faust, the move outside did nothing to improve Mr. Slotterback's work

performance.  (Defs.' SMF, ¶ 30.)  In January of 2000, Mr. Faust and Stacey Knoebel

McDonald, Knoebels' Human Resources Supervisor, held a meeting with Mr. Slotterback to

discuss certain issues.  Shortly thereafter, on January 4, 2000, a "Performance Improvement

Plan Form for Progressive Disciplinary Action" was issued to Mr. Slotterback.  (Dkt. Entry 21, at

108.)  The basis for the disciplinary action was noted as follows:  (1) adding unauthorized

---

[5]Mr. Slotterback disagrees with Mr. Faust's reasons for his promotion, arguing he
earned the position because he was qualified and the right fit.  (Pl.'s SMF, ¶ 29.)

customer accounts to the commission schedule; (2) overtime abuse; (3) inadequate communication of daily sales calls; and (4) poor productivity in the store.  (Id.)  Mr. Slotterback refused to sign the form because he did not think it was fair that his commission was being reduced.  (Slotterback Dep., Dkt. Entry 21, at 38.)  He also thought that he performed well in the store and generated business.  (Id. at 39-40.)

Mr. Slotterback claims that only one unauthorized account was added to his commission schedule, and that was the reason for the meeting.  Mr. Slotterback testified that, while he was checking on the account, he accidently hit a button.  He wasn't sure if it saved the information or not.  (Pl.'s SMF, ¶¶ 31 & 33; Slotterback Dep., at 36-37.)  The change in accounts resulted in an unauthorized payment of $147.87 in commission to Mr. Slotterback.  (Defs.' SMF, ¶ 32.)  Mr. Slotterback admits an unauthorized account was added, but claims he did not realize that he changed the account information in striking the button.  (Pl's. SMF, ¶¶ 33-34.)  At that time, Mr. Slotterback, then forty-two years old, did not think that age was a factor in the decision to issue the written disciplinary action.  (Slotterback Dep., Dkt. Entry 21, at 40-41.)  In hindsight, however, he now believes that age was a factor.  (Slotterback Aff., Dkt. Entry 29-6, ¶ 15.)

Mr. Faust testified that he began to conduct annual formal performance evaluations of lumberyard employees in the year 2000.  (Faust Aff., at 145, ¶ 16.)  Mr. Faust used a numeric scale of zero through four in fifteen different categories.  Each number was assigned a performance level: 0 - unsatisfactory; 1- some deficiencies; 2 - satisfactory; 3 - exceptional; 4 -

clearly outstanding.  (Evaluation Form, Dkt. Entry 21, 109-12.)  Sixty was the maximum score

an employee could obtain.  (Defs.' SMF, ¶ 40.)

Starting in 2000, Mr. Faust met with Mr. Slotterback on an annual basis to present him

with a performance evaluation and discuss his performance.  (Defs.' SMF, ¶ 41.)  On his

employee performance evaluation dated June 15, 2000, Mr. Slotterback received a score of 36

out of 60.  (Dkt. Entry 21, at 111.)  Deficiencies were noted in the areas of "Quantity" (Level of

satisfactory output generated per unit of time), "Innovation" (Imagination and creativity used to

lower costs and improve profits), "Cooperation" (Willingness to help others accomplish their

objectives), "Initiative" (Voluntarily starting projects.  Attempting non-routine jobs and tasks),

and "Stability" (Even temperament [and] acceptance of unavoidable tension and pressure).  Mr.

Slotterback was "clearly outstanding" in other categories, such as "Knowledge" (The blending of

job-related education, skills and experience), "Judgment" (Capacity to make reasonable

decisions), "Attendance", and "Alertness" (Ability to quickly understand new information and

situations).  (Dkt. Entry 21, 110-11.)

The report lists his principal strengths as bringing in several good contractors, improving

purchases on a few accounts, and having knowledge in the building material industry.  (Id. at

112.)  Under comments for weaknesses, the report notes that Mr. Slotterback does not

prioritize customers in the store; does not answer the phone promptly; leaves the store

unattended; does not work well with others; abuses break periods; and does not stand behind

company policies.  (Id.)  Mr. Slotterback disagrees with the evaluation, stating that he answered the phone more times than other employees, other employees left the store, and he was not the only one taking longer breaks.  (Slotterback Dep., at 44.)

Some time during the year 2001, Mr. Slotterback began working as a personal financial analyst, selling insurance and investments for the company Primerica.  (Defs.' SMF, ¶ 53.) Defendants claim that Mr. Slotterback performed work for Primerica while working for Knoebels, and used a company cell phone to make sales calls for Primerica.  (Defs.' SMF, ¶¶ 55 & 58.)  Mr. Slotterback does not deny that he did work for Primerica while on company time. In Mr. Slotterback's affidavit, he states that Mr. Faust implicitly allowed him to conduct his personal business because Mr. Faust invested with him.  (Pl.'s SMF, ¶¶ 54-55.)  He even spoke to some Knoebels' customers about Primerica during working hours.  (Slotterback Dep., at 55-57.)

In his June 3, 2003 performance evaluation Mr. Slotterback received a score of 22 out of 60.  (Dkt. Entry 21, 114-15.)  He did not score a four in any category, and in the majority of categories he received a score of one.  (Id.)   The evaluation noted his strength in negotiating price inventory purchases.  (Id. at 116.)  As weaknesses, the report noted that: "Don needs to attempt to help customers waiting for service at the sales counter; while making outside sales calls Don doesn't speak well of our company and its policies; and Don does not keep adequate records of sales calls."  (Id.)  The evaluation notes that Mr. Slotterback refused to sign it.  (Id.)

6

Mr. Slotterback indicated he refused to sign it because he disagreed with the evaluation. (Slotterback Dep., at 52.)

In his June 8, 2004 performance evaluation he received a score of 21 out of 60.  (Dkt. Entry 21, at 118-19.)  As with the June 2003 evaluation, he scored a one in most categories. Noted as a strength was Mr. Slotterback's relationship with several customers.  (Id. at 120.) His reported weaknesses were listed as follows: needs to follow-up on sales leads; promotes personal business on company time; uses company cell phone for another business; and has unaccountable time both on the road and in the store.  (Id.)

Mr. Slotterback contests Mr. Faust's characterization of his cell phone usage.  He claims he only used the phone a few times when it was necessary to do so.  (Slotterback Dep., at 58-60.)  He claims Mr. Faust approached him, and permitted him to use the cell phone for personal use as long as he paid one-half the bill.  (Id.)  Because Mr. Faust never spoke again to him about the bill, Mr. Slotterback never paid his part.[6]  (Id.)

In his June 16, 2005 performance evaluation, Mr. Slotterback received a score of 29 out of 60.  (Dkt. Entry 21, at 123-24.)  This time he received better than a score of one in most categories, but did not receive a score of four in any category.  (Id.)  The strengths noted in the report were Mr. Slotterback's keeping the inventory stocked and improving on his prior

---

[6]Mr. Slotterback admits that he made out-of-state calls to California (Slotterback Dep., at 60), but claims he only made six calls to California in two years.  (Slotterback Aff., at ¶ 54.)

argumentative attitude.  (Id. at 125.)  The evaluation, however, still noted several weakness.
Mr. Slotterback did not generate new business, follow up on sales calls, or take care of
accounts; had limited knowledge of the point of sale system; and failed to keep records.  (Id.)
The evaluation further noted that improvements on these weaknesses should be made by
September 1, 2005, or removal from his position would be considered.  A follow-up evaluation
was to occur on September 1, 2005.  (Id.)

When asked whether he followed up on leads, Mr. Slotterback stated he did not
because "for the most part I would go see them, but it was too late.  They already started
building and bought their stuff."  (Slotterback Dep., at 68.)  Mr. Slotterback also indicated at his
deposition that he was not good at taking care of records.[7]  (Slotterback Dep., at 65.)

Mr. Faust asserts that by September 1, 2005, Mr. Slotterback had not improved on any
of the principal weaknesses listed in the June 2005 performance evaluation.  (Faust. Aff., Dkt.
Entry 21, at 146, ¶ 24.)  Mr. Faust states he made numerous sales calls with Mr. Slotterback in
order to help him improve his performance, but nothing came of it.[8]  (Id. at ¶ 22.)

On December 30, 2005, Mr. Faust held a meeting with Mr. Slotterback about the outside
sales program.  (Defs.' SMF, ¶ 70.)  Mr. Faust told Mr. Slotterback that his performance was

---

[7]Despite these poor evaluations, Mr. Slotterback claims that he had the impression after
the meetings that he was doing a good job.  (Slotterback Aff., at ¶ 181.)

[8]Mr. Slotterback disagrees and claims that Mr. Faust never made calls with him to
improve his performance.  (Slotterback Aff., at ¶ 216.)  He did state, however, that Mr. Faust
rode with him six times a year.  (Id. at ¶ 221.)

unsatisfactory and that he would no longer receive commission on his accounts.  (Faust Aff., Dkt .Entry 21, at 146, ¶¶ 25, 27.)  From that point forward, Mr. Slotterback was required to record his sales and to obtain at least one new contractor customer per quarter who averaged at least $2,000 in monthly purchases.  (Id. at 147, ¶ 29.)

Mr. Faust claims that by the end of the first quarter of 2006, Mr. Slotterback had failed to meet the objectives set at the December 30, 2005 meeting.  (Id. at 147, ¶ 33.)  Mr. Slotterback testified that he failed to add any new customers because the winter months are slow.  (Id. at 147, ¶ 34; Slotterback Dep., at 72-76.)  He also claims he did not have any literature for the new products that Knoebels was marketing to contractors at the time.  (Slotterback Aff., at ¶¶ 198-200.)

Mr. Faust claims that Mr. Slotterback abused overtime in showing up to work early, punching-in, and reading a magazine.  (Faust Aff., Dkt .Entry 21, at 147, ¶ 36.)  Mr. Slotterback admits that he "might have looked at a few magazines," but states that he was not the only one to do this.[9]  (Slotterback Dep., at 77.)  Mr. Faust also believes that Mr. Slotterback spent significant time at a park in Bloomsburg during his working hours and made non-work-related telephone calls.  (Faust Aff. at 147, ¶ 37.)  One day, Mr. Faust asked Mr. Slotterback to work a Friday night at the Builder's show and Mr. Slotterback at first refused because he was going to

---

[9]Mr. Slotterback stated that he punched in more than one-half hour early each morning. (Slotterback Dep., at 77.)

his cabin.  (Slotterback Dep., at 78-79.)  Mr. Slotterback then reconsidered and offered to go if

he could take off the following Monday.  (Id.)  Mr. Slotterback feels he was being singled out

because the previous two years he was not asked to work at the Builder's show.[10]  (Id. at 79-

78.)

    In March of 2006, Mr. Faust met with Richard Knoebel and Brian Knoebel to discuss Mr.

Slotterback's performance.  (Defs.' SMF, ¶ 82.)  Those attending the meeting decided to

discharge Mr. Slotterback for unsatisfactory performance and conduct.  (Id. at ¶ 83.)  Mr. Faust

listed the reasons for Mr. Slotterback's termination as not meeting sales requirements; a lack of

product knowledge and sales technique; failure to learn the lumberyard's point-of-sale system;

unwillingness to work special hours; wasting time; negative comments to customers; and abuse

of a company cell phone.  (Dkt. Entry 21, at 157.)

    On March 27, 2006, Brian Knoebel, Richard Knoebel, and Mr. Faust met with Mr.

Slotterback and informed him that his employment with Knoebels was terminated.  (Defs.' SMF,

¶ 42.)  Mr. Slotterback was informed that his performance was less than satisfactory and told

the reasons for his termination.  (Id. at ¶ 43.)  Mr. Slotterback claims that the meeting only

lasted five minutes and the he was terminated unjustly.  (Pl.'s SMF, ¶ 84.)  According to Mr.

---

[10]Mr. Slotterback testified that Mr. Faust cornered him one time to ask him about "talk of
unions" among the employees.  (Slotterback Dep., at 63.)  He felt he was being singled out, but
did not know if it was because of his age.  (Id.)  Mr. Slotterback also felt, after speaking to other
employees, that Mr. Faust was watching him.  (Slotterback Dep., at 102.)

Slotterback, the only areas discussed at the meeting were his lack of sales, the incident with the Builder's show, and his cell phone.  (Id.)  Mr. Slotterback feels that Defendants were mistaken in the perception of these incidents.  He was about to acquire a large account with Brookside Homes, but was terminated.  (Id.)  Mr. Slotterback also claims that he was not given sufficient time to promote a new product.  (Id.)  He asserts that Richard Knoebel kept his head down during the meeting and lied in stating there were no other jobs for Mr. Slotterback because hundreds of employees would be hired for the opening of the amusement park in the summer months.  (Id. at ¶ 86.)

As of the date of his termination Mr. Slotterback was 48 years old.  (Defs.' SMF, ¶ 87.) On July 19, 2006, Mr. Slotterback filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), alleging that Defendants discharged him on account of his age.  (Id. at ¶ 88.)

Knoebels' management selected Gary Davis, age 31, a truck driver and delivery person in the lumberyard, to replace Mr. Slotterback in the outside sales position.  (Faust Aff., at 149, ¶ 45.)  Mr. Faust had conducted annual performance evaluations of Mr. Davis in the years 2002, 2003, 2005, 2006, and 2007.  (Defs. SMF, ¶ 93.)  Mr. Davis received scores of 56, 57, 58, 50, and 51 respectively.  (Id. at ¶ 94.)   Mr. Slotterback believes that Mr. Faust and Mr. Davis were good friends, and that Mr. Faust purposefully misrepresented Mr. Davis' scores in order to give him the promotion.  (Pl.'s SMF, ¶ 90.)

Mr. Slotterback claims that other employees were treated more favorably than he.[11] (Defs.' SMF, ¶ 95.)  He claims that several employees were allowed to violate company policy but nothing was ever done.  (Pl.'s SMF, ¶ 95.)  Other employees were tying up the company phone lines with matters unrelated to work; using the computer for online shopping; and consuming alcohol while at work.  (See Slotterback Aff., Dkt. Entry 29-6, ¶¶ 36-120.)

Mr. Slotterback claims that employees Dave Mowery and Dennis Hepler made personal phone calls on company time and were not disciplined.[12]  (Defs.' SMF, ¶ 99.)  Defendant observes that, even if this is true, the employees had not been issued a company cell phone. (Slotterback Dep., 85.) They also point out that Dave Mowery's date of birth is July 4, 1934, and Dennis Hepler's date of birth is November 4, 1952.  (Defs.' SMF, ¶¶ 101-102.) Thus, both men are older than Mr. Slotterback.  (Defs. SMF, ¶ 103.)

Mr. Slotterback also claims that Bill Knapick, a Knoebels' lumberyard employee, made telephone calls to his stockbroker using a company telephone.  (Defs.' SMF, ¶ 106.)  Mr. Knapick is also alleged to have run to the break truck to get his doughnuts and milk at the expense of helping customers.  (Slotterback Dep., at 94.)  Mr. Knapick's date of birth is

---

[11]In his Affidavit, Mr. Slotterback claims, without any specific evidentiary support, that Knoebels "has a history of discriminating against older workers and forcing them into retirement or being terminated."  (Slotterback Aff., at ¶ 36.)

[12]Mr. Slotterback claims Dennis Hepler made phone calls to have liquor delivered once a week.  (Slotterback Dep., at 86.)  He further claims that Dave Mowery called his girlfriend from 4:45 p.m. to 5:00 p.m. every day (Id. at 87.)  Mr. Slotterback does not think that any of these calls were made on a company cell phone.  (Id. at 88.)

December 15, 1957, the same year as Mr. Slotterback's date of birth.  (Defs.' SMF, ¶ 107.)

Mr. Slotterback alleges that Dale Persing, a lumberyard employee, drank alcohol and was intoxicated at work, but received no discipline.  (Defs.' SMF, ¶ 108.)  Mr. Persing was born on March 31, 1940, and is older than Mr. Slotterback.  (Id. at ¶ 109.)

Mr. Slotterback further claims that Dean Thomas, a lumberyard employee, would assemble guns on work time.  (Id. at ¶ 114.)  Mr. Thomas' date of birth is February 24, 1952, five years before Mr. Slotterback's.  (Id. at ¶ 115.)

Mr. Slotterback claims that lumberyard employees Dave Mowery, Dean Thomas, and Melissa Yadakowsky took longer breaks than permissible and received no discipline.  (Id. at ¶ 118.)  Mr. Slotterback alleges that Dave Mowery frequently arrived at work early and punched in.  (Pl.'s SMF, ¶ 119.)  He further claims he was never told to stop reading magazines, and that Mr. Faust even brought him magazines to read during work time.  (Id.)  Mr. Slotterback also claims that Dave Mowery left the lumberyard store to drive his daughters to school.[13]

Mr. Slotterback claims that Melissa Yadakowsky, who is in her thirties, shopped online on a weekly basis, usually on Tuesday and Friday afternoons.  (Slotterback Aff., ¶ 70.)  Mr. Faust states he was unaware of the online shopping, and was not present when it occurred.  (Faust Aff., at 150, ¶ 60.)  Rich Mowery, another lumberyard employee in his thirties, is alleged

---

[13]This event occurred in 1997, before Mr. Faust became General Manager of the lumberyard store.  (Defs.' SMF, ¶ 120.)

to have gone golfing in the afternoons, leaving three or four hours early.  His Dad, Dave

Mowery, would punch him out at 5:00 p.m.  (Slotterback Aff., ¶ 71.)  Mr. Faust states that this

occurred before he became manager, and that management addressed the issue.[14]  (Faust

Aff., at 150, ¶ 58.)

Mr. Slotterback further claims that other employees drove home company-owned

vehicles in 1999 when Mr. Slotterback first began working in the outside sales position, but

Richard Knoebel refused to allow him to do the same.  (Defs.' SMF, ¶ 127.)  Mr. Slotterback did

not name any employees who worked in the lumberyard on a permanent basis who took

vehicles home.  (Slotterback Dep., 91.)  Mr. Slotterback claims that Wes, a carpenter who

worked mostly in the park, and Joe Cecco, were able to drive their trucks home.  (Slotterback

Dep., at 92-93.)  Wes was the about the same age as Mr. Slotterback.  (Id. at 93.)

Mr. Slotterback alleges that Dave Knoll, an accountant for Knoebels, was doing taxes in

the store for people while at work.  (Defs.' SMF, ¶ 131.)  Mr. Knoll was in his forties at the time

of Mr. Slotterback's termination.  (Slotterback Dep., at 101.)  Mr. Faust claims that he never

knew that Mr. Knoll was doing taxes for individuals while working.  (Defs.' SMF, ¶ 132.) Mr.

Slotterback claims that Mr. Faust's desk was next to his, so Mr. Faust must have known.  (Pl.'s

SMF, ¶ 132.)

---

[14]Mr. Slotterback agrees that this conduct occurred before Mr. Faust became manager.
(Slotterback Dep., at 90.)

Mr. Slotterback alleges that Holly Duraski, a twenty-seven year old lumberyard employee, would arrive late for work and fight with her husband on the office phone while at work.[15]  (Id. at ¶ 136.)  Mr. Faust states he was not aware that Mrs. Duraski used the phone to fight with her husband while working.  (Faust Aff., at 151, ¶ 62.)

Finally, Mr. Slotterback alleges that Barry Brophy, a lumberyard employee in charge of kitchen design, avoided customers most of the time and tried to look busy.  (Slotterback Dep., at 99; Dkt. Entry 29-4, at 4.)  Mr. Brophy was older than Mr. Slotterback.  (Slotterback Dep., at 100.)

## II.  DISCUSSION

### A.  Summary Judgment Standard

Summary judgment should be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  A fact is "material" if proof of its existence or nonexistence might affect the outcome of the suit under the applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

---

[15]Mr. Slotterback is not aware of any employees at Knoebels abusing a company cell phone.  (Slotterback Dep., at 88.)

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to nonmoving party. Cont'l Ins. Co. v. Bodie, 682 F.2d 436, 438 (3d Cir. 1982). The moving party has the burden of showing the absence of a genuine issue of material fact, but the nonmoving party must present affirmative evidence from which a jury might return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 256-57. Merely conclusory allegations taken from the pleadings are insufficient to withstand a motion for summary judgment. Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990). Summary judgment is to be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

B.  Age Discrimination Claims

Under the ADEA, it is unlawful for an employer "to discharge any individual . . . because of such individual's age" or to "limit, segregate, or classify [ ] employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age. . . ." 29 U.S.C. § 623(a)(1) & (a)(2). Under the PHRA, it is "an unlawful discriminatory practice . . . [f]or any employer because of the . . . age . . . of any individual . . . to discharge from employment such individual

16

. . . ." 43 Pa. Cons. Stat. § 955(a). In order to prevail on a claim of age discrimination under Title VII, or its analogous provision in the PHRA,[16] Mr. Slotterback must satisfy the three step burden shifting inquiry under the Third Circuit's slightly modified version of the familiar test enunciated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804 (1973).[17] See Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc); Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir. 1995); see also Glanzman v. Metro. Mgmt. Corp., 391 F.3d 506, 509 n.2 (3d Cir. 2004) (same legal standard applies to claims under the ADEA and the PHRA).

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Id., at 802, 93 S.Ct., at 1824. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

Texas Dept. of Comty. Affairs v. Burdine, 450 U.S. 248, 252-253 (1981).

> 1. Mr. Slotterback's Prima Facie Case

A plaintiff establishes a prima facie case of age discrimination by showing that: (1) he

---

[16]Employer liability under the PHRA follows the standards set out for employer liability under Title VII. Knabe v. Boury Corp., 114 F.3d 407, 410 n.5 (3d Cir. 1997); see also West v. Phila. Elec. Co., 45 F.3d 744 (3d Cir. 1995); Faust v. Scranton Petro, No. 3:CV-06-0672, 2008 WL 906462, at *6 n.8 (M.D. Pa. Mar. 29, 1997).

[17]Because Mr. Slotterback seeks to prove his claim through circumstantial evidence, the familiar burden shifting framework of McDonnell Douglas is implicated.

was a member of a protected class (i.e., was over forty years old); (2) he was qualified for the position in question; (3) he suffered an adverse employment decision, such as discharge; and (4) the adverse decision occurred under circumstances giving rise to an inference of discrimination.  See Sarullo v. U.S. Postal Service, 352 F.3d 789, 797 (3d Cir. 2003); Taylor v. Phoenixville School Dist., 184 F.3d 296, 306 (3d Cir. 1999); Potence v. Hazleton Area School Dist., 357 F.3d 366, 370 (3d Cir. 2004).  There is no fixed rule as to what a plaintiff must show in order to establish the McDonnell Douglas prima facie showing.  Rather, "the precise elements of a plaintiff's prima facie case may vary with the particular circumstances."  Waldron v. SL Indus., Inc., 56 F.3d 491, 494 n.3 (3d Cir. 1995); Fasold v. Justice, 409 F.3d 178, 185 n.10 (3d Cir. 2005).

Defendants contest the second element of Plaintiff's prima facie case – his qualification for the position of outside sales person.  Relying on the performance evaluations and Plaintiff's alleged misconduct during the five years prior to his termination, Defendants argue that "Plaintiff was not performing his outside sales position at a level anywhere near [Knoebels'] legitimate expectations."  (Defs.' Br. Supp. Mot. Summ. J., Dkt. Entry 23, at 12-16.)

Our Court of Appeals has held that "'while objective job qualifications should be considered in evaluating the plaintiff's prima facie case, the question of whether an employee possesses a subjective quality . . . is better left to the later stage of the McDonnell Douglas analysis.'"  Matczak v. Frankford Candy and Chocolate Co., 136 F.3d 933, 938 -39 (3d Cir.

1997) (citing <u>Weldon v. Kraft</u>, 896 F.2d 793, 798 (3d Cir.1990)).  "The rationale behind this position is that subjective evaluations are more susceptible of abuse and more likely to mask pretext and, for that reason, are better examined at the pretext stage than at the prima facie stage."  <u>Id.</u>  (internal citations omitted).

Here, Defendants have not submitted a list of job qualifications for Plaintiff's position, nor do they assert, in testimony or in the performance evaluations, that Plaintiff was not objectively qualified for his job, i.e., did not have the proper experience, education, training or competency (job requirements).  Instead, Defendants complain of his performance and misconduct (subjective traits).  Moreover, the fact that Defendants employed Plaintiff for over thirty years, and promoted him, belies any assertion that Plaintiff was not qualified.  <u>See</u> <u>Jalil v. Avdel Corp.</u>, 873 F.2d 701, 707 (3d Cir. 1989) (finding that the employee's employment for eight years and promotion during that period "clearly established his qualifications for the job.").  Although Defendants have tendered substantial evidence of Plaintiff's poor performance and misconduct, this evidence is more appropriately considered at the pretext stage.  Thus, Plaintiff has made a sufficient showing that he was qualified for his job.  <u>See</u> <u>Seibel v. Marketplace Direct, Inc.</u>, No. 2:05CV684, 2007 WL 788384, at *2 (W.D. Pa. Mar. 13, 2007) (holding that the plaintiff satisfied the "job qualification" element of the prima facie case because the defendants challenged the plaintiff's performance, and not his qualifications for the position).

### 2.  Knoebels' Legitimate, Non-discriminatory Reason

Now that a prima facie case has been established, the burden of production shifts to the employer to tender legitimate, non-discriminatory reasons for its treatment of and decision to terminate the plaintiff.  Keller, 130 F.3d at 1108.  This is a "relatively light burden."  Fuentes, 32 F.3d at 763.  Well-documented poor work performance and misconduct are generally considered legitimate, non-discriminatory reasons for the termination of an employee and for changes in the terms and conditions of employment.[18]  See Healy v. New York Life Ins. Co., 860 F.2d 1209, 1214 (3d Cir. 1988); Cleary v. CBRL Group, No. 3:05-cv-02246, 2007 WL 2212846, at *6 (M.D. Pa. July 31, 2007) (citing Pollock v. American Tel. & Tel. Long Lines, 794 F.2d 860, 863-864 (3d Cir. 1986)); Seibel, 2007 WL 788384, at *3.  The performance evaluations, written disciplinary action, and testimony of Mr. Faust provide an ample evidentiary foundation to satisfy Defendants' burden of articulating a legitimate, non-discriminatory reason for the adverse employment action.

### 3.  The Two-prong Fuentes Test

Because Knoebels has satisfied its relatively light burden of demonstrating a legitimate, non-discriminatory reason, the burden of production shifts back to Mr. Slotterback, who now must present evidence sufficient to support an inference that Knoebels' articulated rationale is a

---

[18]Notably, Plaintiff does not argue that Defendants failed to tender a legitimate, non-discriminatory reason for his termination.

pretext for age discrimination.  <u>Showalter v. Univ. of Pittsburgh Med. Ctr.</u>, 190 F.3d 231, 235 (3d Cir.1999); <u>Fuentes</u>, 32 F.3d at 763.  Our Court of Appeals has recognized two ways in which a plaintiff can prove pretext.  First, the plaintiff can present evidence that "casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication."  <u>Fuentes</u>, 32 F.3d at 762.  Second, and alternatively, the plaintiff can provide evidence that "allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."  <u>Id.</u>  The <u>Fuentes</u> court further explained:

> To discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.  Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence.

<u>Id.</u> at 765; <u>Keller v. Orix Credit Alliance, Inc.</u>, 130 F.3d 1101, 1108-09 (3d Cir.1997) (citation omitted); <u>see</u> <u>Atkinson v. Lafayette College</u>, 460 F.3d 447, 454 (3d Cir. 2006).  "[T]he plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a <u>post</u> <u>hoc</u> fabrication or otherwise did not actually motivate the employment action."  <u>Id.</u> (internal citations omitted).

Under prong one of <u>Fuentes</u>, "the question is not whether the employer made the best,

or even sound, business decision; it is whether the real reason is discrimination." Keller, 130 F.3d at 1109 (citing Carson v. Bethlehem Steel Corp., 82 F.3d 157, 159 (7th Cir. 1996)). Accordingly, Mr. Slotterback must show, not merely that Knoebels' reason for disciplining and firing him were wrong, but that it was so plainly wrong that it cannot have been Knoebels' real reason.  Mr. Slotterback has failed to make such a showing.

Defendants have submitted substantial, compelling evidence of Mr. Slotterback's poor work performance and misconduct.  As evidence of Plaintiff's misconduct, Defendants point to the written disciplinary action issued to Mr. Slotterback in January of 2000.  The report stated that Mr. Slotterback added a customer account to his commission without authorization, abused his overtime, failed to communicate with his daily calls, and performed poorly in the store.  As evidence of Plaintiff's poor work performance, Defendants have included his performance evaluations from the years 2000, 2003, 2004, and 2005.  Out of a possible 60 points, Plaintiff scored a 36, 22, 21, and 29.  Weaknesses noted in these reports are numerous:  abusing break periods, not prioritizing customers, speaking poorly of the company and its policies, promoting business on company time, failing to keep records and follow-up on leads, and failing to generate new business.  Mr. Faust also testified that Plaintiff abused overtime, spent time in a park in Bloomsburg during working hours, and was unwilling to work special hours.

Making Defendants' reasoning for Plaintiff's discipline and termination more forceful and difficult to undermine are Plaintiff's admissions.  Plaintiff admits that he took long breaks, used

the company cell phone for personal business, and did not follow up on leads.  He further admits that he punched in early at work, read magazines while at work, failed to generate new business after being told that he needed to do so, and added an unauthorized account to his commission schedule.  Significantly, Plaintiff admitted that, when he received disciplinary action, he did not think age was a factor.  (Slotterback Dep., Dkt. Entry 21, at 40-41.) This admission undermines Plaintiff's post-litigation assertion of age bias.

Plaintiff expends considerable time disagreeing with Mr. Faust, the written disciplinary action, and the performance reviews.  He claims that he performed well in the store and generated business. He also attests that he answered the phone more than any other employee and claims that adding the unauthorized account to his schedule was an accident. But the question is not whether Knoebels' actions were right or wrong.  Keller, 130 F.3d at 1109.  Rather, Plaintiff is required to tender sufficient evidence to show "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." Fuentes, 32 F.3d at 765.

Mr. Slotterback attempts to undermine or call into question Knoebels' non-discriminatory reason by offering justifications for his actions.  He claims the allegations of cell phone abuse are unfounded because he was permitted to use the cell phone for personal business, and would have paid one-half the bill if Mr. Faust had reminded him.  He further claims he did not

follow up on all leads because they were generally dead ends.  He admits that he did work for Primerica while on company time, but claims Mr. Faust gave him permission.  He was not the only one punching in early and reading magazines, and he could not add anyone in the first quarter of 2006 because it was impossible during the winter months when sales were slow.

These explanations fail to sufficiently call into question or undermine Knoebels' non-discriminatory reason.  Plaintiff's explanations are not grounded in facts or substantiated by the record.  Plaintiff seems to suggest that Mr. Faust trapped him in allowing him to use the cell phone and work for Primerica while on company time, and then reprimanded him for doing so.  The evidence does not support this, nor does it somehow undermine Knoebels' proffered reasons.  Plaintiff has not pointed to conflicting reasons for his termination or inconsistencies in Defendants' actions as required.  See Faust v. Scranton Petro, L.P., No. 3:CV-06-0672, 2008 WL 906462, at *8 (M.D. Pa. Mar. 31, 2008) (finding a proper inference of pretext could be raised when the plaintiff pointed "to conflicting testimony as to why she was selected for termination.").  In short, Plaintiff's explanations and "criticisms amount to little more than the schoolground retort, 'Not so,' an approach which . . . does not create a material issue of fact." Fuentes, 32 F.3d at 766.

Under the second prong of Fuentes, Mr. Slotterback must identify evidence in the summary judgment record that "allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Fuentes, 32

F.3d at 762.  "In other words, under this prong, [a plaintiff] must point to evidence that proves

age discrimination in the same way that critical facts are generally proved – based solely on the

natural probative force of the evidence."  Keller, 130 F.3d at 1111.

Plaintiff insists that age discrimination was the impetus of his termination and poor

performance reviews, arguing that other employees received more favorable treatment than he.

(Br. Opp'n Mot. Summ. J., Dkt. Entry 28, at 18.)  Plaintiff was replaced by Gary Davis, a worker

in his mid-thirties.  Mr. Faust stated he promoted Mr. Davis because Mr. Davis scored well on

the performance reviews.  Plaintiff argues that Mr. Davis was chosen because of his close

friendship with Mr. Faust and that Mr. Faust misrepresented Mr. Davis' performance evaluation

scores.  No facts on the summary judgment record support Plaintiff's testimony, or suggest that

Mr. Faust favored Mr. Davis because of his age, or that the information in the performance

reviews was misrepresented.  Thus, although Plaintiff was replaced by a younger worker, there

is insufficient evidence for a jury to draw an inference that discrimination was more likely than

not the cause of this change.

Plaintiff claims several employees received preferential treatment.  Specifically, he

claims that Dave Mowery, Dennis Helper, Bill Knapick, Dale Persing, Barry Brophy, Dean

Thomas, and an employee with the first name Wes received more favorable treatment than he

at work.  Each of these co-workers are the same age or older than Plaintiff.  The Supreme

Court has explained that, in the age-discrimination context, "an inference that an employment

decision was based on illegal discriminatory criterion . . . cannot be drawn from the replacement of one worker with another worker insignificantly younger." <u>O'Connor v. Consolidated Coin Caterers Corp.</u>, 517 U.S. 308, 313 (1996).  The same is true when a plaintiff attempts to prove age discrimination by disparate treatment with employees of the same age or older.  "The prefatory provisions and their legislative history make a case that we think is beyond reasonable doubt, that the ADEA was concerned to protect a relatively old worker from discrimination that works to the advantage of the relatively young." <u>General Dynamics Land Systems, Inc. v. Cline</u>, 540 U.S. 581, 590-91 (2004).  Comparing employees of the same age or older cannot show that any advantage was given to younger workers, or any disadvantage to older workers.  Therefore, a jury could not draw an inference from comparison of the employees listed by Plaintiff that, more likely than not, Plaintiff was discriminated against on account of his age.

Plaintiff further claims that several younger employees received preferential treatment. Plaintiff testified that Melissa Yadakowsky shopped online on a weekly basis; Rich Mowery would leave work early to go golfing and his Dad would punch out for him at 5:00 p.m.; Joe Cecco was able to drive his truck home; Dave Knoll did taxes in the store while at work; and Holly Duraski arrived late for work and used the office phone for personal calls to her husband.

Mr. Faust responds to each of these.  With respect to Ms. Yadakowsky, Mr. Knoll and Mrs. Duraski, he claims he was unaware of the conduct.  He claims, and Plaintiff agrees, that

he was not a manager when Rich Mowery was leaving work early.   And Mr. Cecco was not a

lumberyard employee.  Moreover, there is no evidence that these younger workers were

treated more favorably than Plaintiff despite similar misconduct and poor sales performance.

See, e.g., Mincevich v. Bavarian Pretzel Bakery, 418 F. Supp. 2d 634, 641 (M.D. Pa. 2005)

(finding no basis for pretext in the plaintiff's firing based on a poor sales record as a store

manager because there was no evidence that younger store managers were treated more

favorably despite similarly poor sales performances).

Plaintiff generally contends that Defendants singled him out and selectively disciplined

him.  For example, he claims he was asked to work at the Builder's show on the weekend one

year, while the previous two years he was not.  These allegations, even if true, are simply not

evidence that younger workers in the lumberyard store were treated differently, or more

favorably, than he.  Moreover, there is no evidence that younger workers did not have to work

the Builder's show.

Finally, Plaintiff claims that it was unfair that his commissions (not the commission he

claims he inadvertently added to his schedule) were taken from him.  (Slotterback Dep., at 36-

38.)  Mr. Faust explained that Plaintiff did not receive commission on accounts he neglected.

(Faust Aff., 146, ¶ 27.)  Plaintiff does not claim he took care of those accounts, or even mention

the specific accounts.  Even crediting Plaintiff's testimony, there is no evidence that

commissions were taken from him because of his age.[19]

In short, it may be that Mr. Faust paid particularly close attention to Plaintiff's work performance, or that others were treated differently than Plaintiff, but there is simply a dearth of evidence that Defendants took action for reasons other than those they have advanced in this case.  From the evidence presented, a jury could not infer that the reasons articulated by Defendants for firing Plaintiff are pretextual or that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.  See Keller, 130 F.3d at 1111 (citing Fuentes, 32 F.3d at 762).

---

[19] In Weldon v. Kraft, Inc., 896 F.2d 793 (3d Cir. 1990), a race discrimination case, the plaintiff alleged one black trainee was forced to seek help from other managers and another black trainee transferred out of plaintiff's department to avoid losing his job because the manager, Gier, treated black employees unfairly.  Id. at 794-795.  The plaintiff claimed other black co-workers received poor evaluations from Gier and had personal confrontations with him.  Id. at 795.  The plaintiff further claimed that another supervisor admitted that Gier had difficulty working with minorities.  Id.  The plaintiff also produced statistical evidence indicating a disproportionate number of black employees were fired compared to white employees.  Id. at 796.  The Third Circuit overturned the district court's grant of summary judgment because it found that a jury could reasonably infer that the employer's proffered reason was pretext.  Id. at 799. The court explained that "there is no rule of law that the testimony of a discrimination plaintiff, standing alone, can never make out a case of discrimination that could withstand a summary judgment motion."  Id. at 800.

In this matter, by way of contrast, Plaintiff's testimony, standing alone, is insufficient to make out a case of age discrimination.  Plaintiff has not provided any competent evidence that other older employees were treated harshly, that Mr. Faust, Brian Knoebel, or Richard Knoebel generally favored younger employees, or that managers at Knoebels had difficulty working with older persons.  Nor is there statistical evidence of older persons being terminated.  In short, Mr. Slotterback has not testified as the plaintiff in Weldon so as to undermine Knoebels' proffered reasons or to create a reasonable inference that, more likely than not, his age played a role in Knoebels' actions.

III.  CONCLUSION

Because there is a lack of evidence that the reasons advanced by Defendants are not the real reasons for Plaintiffs' treatment and discharge, and there is no evidence from which a jury could infer a discriminatory animus based on his age, Plaintiff cannot thwart Defendants' Motion for Summary Judgment, which will be granted.  An appropriate Order follows.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DONALD H. SLOTTERBACK, JR., :
    Plaintiff :
       :
  v.     :   3:CV-07-0341
       :   (JUDGE VANASKIE)
RICHARD KNOEBEL, BRIAN KNOEBEL, :
H.H. KNOEBEL SONS, INC., :
    Defendants :

ORDER

NOW, THIS 14th DAY OF APRIL, 2009, for the reasons set forth in the foregoing memorandum, IT IS HEREBY ORDERED THAT:

1.  Defendants' Motion for Summary Judgment (Dkt. Entry 20) is GRANTED.  The Clerk of Court shall enter judgment in favor of Defendants and against Plaintiff.

2.  The Clerk of Court is directed to mark this matter CLOSED.

       s/ Thomas I. Vanaskie
       Thomas I. Vanaskie
       United States District Judge